UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| METLIFE INVESTORS USA INSURANCE COMPANY,<br><br>        Plaintiff,<br><br>        v.<br><br>ESTATE OF MELINDA LINDSEY and JULIE KIRBY, in her capacity as Personal Representative of the Probate Estate of Melinda Lindsey,<br><br>        Defendants. | CAUSE NO.: 2:16-CV-97-TLS |
| ESTATE OF MELINDA LINDSEY and JULIE KIRBY, in her capacity as Personal Representative of the Probate Estate of Melinda Lindsey,<br><br>        Counter-Plaintiffs,<br><br>        v.<br><br>METLIFE INVESTORS USA INSURANCE COMPANY,<br><br>        Counter-Defendant. | |

**OPINION AND ORDER**

This matter is before the Court on a Motion for Summary Judgment [ECF No. 87], filed by Plaintiff/Counter-Defendant MetLife Investors USA Insurance Company ("MetLife"), a Motion to Strike the Affidavit of John F. Fitzgerald [ECF No. 100] filed by MetLife, and a Motion to Strike MetLife's Supplemental Designation of Evidence and Corresponding Portions of Reply Brief [ECF No. 103], filed by Defendants/Counter-Plaintiffs Estate of Melinda Lindsey

and Julie Kirby in her capacity as Personal Representative of the Probate Estate of Melinda Lindsey (collectively, the "Estate"). The motions are fully briefed and ripe for ruling. For the reasons detailed below, the Court denies MetLife's motion for summary judgment and denies as moot the motions to strike. All claims remain pending for trial.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When the movant seeks summary judgment on a claim on which it bears the burden of proof at trial, the movant "must lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015); *see also Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 42 (7th Cir. 1992) ("[B]ecause Owens-Corning and CertainTeed . . . have the burden at trial of establishing good faith, they must establish affirmatively the lack of 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986))). "If the movant has failed to make this initial showing, the court is obligated to deny the motion." *Hotel 71 Mezz Lender LLC*, 778 F.3d at 601.

When the movant seeks summary judgment on a claim for which the non-movant bears the burden of proof at trial, the movant may demonstrate that it is entitled to judgment as a matter of law by "either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*,

2

817 F.3d 1010, 1015–16 (7th Cir. 2016) (citation omitted). In response, the non-movant "must make a sufficient showing on every element of his case on which he bears the burden of proof; if he fails to do so, there is no issue for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

In ruling on a motion for summary judgment, a court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citation omitted). A court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted). Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Anderson*, 477 U.S. at 248.

## FACTUAL BACKGROUND

On October 17, 2013, Steven Lindsey spoke by telephone with David Ambler, a licensed insurance agent with MetLife. Estate Ex. D, pp. 2–3, ECF No. 97-2. Steven explained:

> I'm looking to get my life insurance policy renewed. I had one with you guys there for a long time and then I got divorced. And then my ex-wife got the balance of the term life today and the other one just got canceled and I'd like to at least get the short-term one going again until I can get my mind wrapped around so I can start the term life insurance policy. And also I had questions about getting my current fiancée on life insurance. We have a child together and I think it would be a better idea to help her (inaudible).

*Id*. at 4:10–21. Steven stated that he believed he previously had a million-dollar policy for himself, and Mr. Ambler quoted Steven the premium for a million-dollar, 10-year term policy for himself as well as for his fiancée, Melinda. *Id*. at 5:13, 14:7–12, 18:5–7.

On January 2, 2014, Melinda, then Steve's wife, completed an application over the telephone with Mr. Ambler for a term life insurance policy and an accidental death benefit rider with MetLife ("Application"). MetLife Ex. 1 ¶ 5 (Fluharty Aff.), ECF No. 88-1; MetLife Ex. 1-B, ECF No. 88-3; Estate Ex. I, ECF No. 97-3. During the call, Melinda confirmed that she was financially dependent on Steven. Estate Ex. I 12:21, 30:7–9. Mr. Ambler asked, "And do you know how much life insurance Steven has now?" *Id.* at 30:10–11. Melinda responded, "[T]wo million." *Id.* at 30:12. The written Application contained the answers that Melinda is a "homemaker" and "mother," that she was financially dependent on her spouse, Steven, that Steven's earned annual income was $180,000, and that Steven had insurance in the amount of $2,000,000. MetLife Ex. 1-B at 1, 3. Steven is listed as the primary beneficiary on the Application. *Id.* at 2. Melinda also answered questions about her medical history in the Medical Supplement portion of the Application. *Id.* at 9–13. Melinda electronically signed the Application, agreeing that, among other things, she "read this application for life insurance including any amendments and supplements" and "to the best of my knowledge and belief, all statements are true and complete." *Id.* at 6, 7.

On January 31, 2014, Steven contacted MetLife by telephone and spoke with MetLife representative Ashley. Estate Ex. F, ECF No. 97-2. Ashley confirmed that, although Steven had previously spoken with Mr. Ambler, her office was now handling the Application while it was in underwriting. *Id*. 4:8–15. Steven asked,

> [D]o you know what - - is there like an estimated ETA on when I'll know? Because I was gonna do mine as well, get my policy going, but I'm actually in the middle of changing jobs and so I wanted to wait until I got into my new position because they offer life insurance too and I wanted to see what it is that they offer.

*Id*. at 5:2–8. Ashley indicated that the average review time is four to eight weeks. *Id*. at 5:19–21.

On March 26, 2014, MetLife issued policy number MLT140D065 to Melinda with a benefit amount of $1,000,000 ("Policy"). MetLife Ex. 1-A, p. 3, ECF No. 88-2. In the General Provisions section, the Policy contains an "Incontestability" clause that provides: "We cannot contest the coverage after the Policy has been in force during the lifetime of the Insured for two years from its Issue Date. This provision will not apply to any rider that contains its own incontestability clause." *Id*. at 9. An Accidental Death Benefit Rider in the amount of $100,000 was also issued on March 26, 2014, with an incontestability clause that provides: "This Rider will not be contestable after it has been in force during the lifetime of the Insured for two years from the Issue Date of this Rider." *Id*. at 3, 19.

On January 16, 2015, within the contestability period, Melinda was shot and killed. *See* MetLife Ex. 1, ¶ 13; MetLife Ex. 1-C (Death Certificate), ECF No. 88-4. On February 12, 2015, Steven was arrested and charged with Melinda's murder. Estate SJ Ex. E, ECF No. 42-2.

MetLife conducted a contestability period investigation to verify the information provided in the Application, including, as relevant here, the statement that Steven had an insurance policy. *See* MetLife Ex. 1, ¶ 13; MetLife Ex. 2, ¶¶ 4, 7 (Mirabelli Aff.), ECF No. 88-7. The investigator, Gregory Mirabelli, states in his affidavit, "My normal course of investigation would be to interview Steven Lindsey, who was named as the beneficiary on the policy, in order to verify that information, but when I began my investigation I learned that Steven Lindsey was incarcerated and was not available to be interviewed." MetLife Ex. 2, ¶ 9. Mr. Mirabelli did not make an effort to speak with Steven. Estate Ex. C 11:16–12:13 (Mirabelli Dep.), ECF No. 97-2. Mr. Mirabelli interviewed Melinda's parents, but they were unable to provide information about any insurance for Steven. MetLife Ex. 2, ¶ 10.

As part of the investigation, Mr. Mirabelli checked MetLife's records and did not find any life insurance policy for Steven with MetLife that was in effect at the time of Melinda's Application. *Id.* at ¶ 11.

Mr. Mirabelli also made inquiries with fifteen life insurers or reinsurers. *Id.* at ¶ 12; Estate Ex. C-3, ECF No. 97-2. The inquiries were made of industry contacts that Mr. Mirabelli had developed over the years through his investigative work. Estate Ex. C 16:21–17:9. Those fifteen contacts do not reflect all life insurance carriers or reinsurance carriers that provide life insurance. *Id.* at 17:10–15. For example, Mr. Mirabelli did not contact Allstate Insurance Company, American Family Insurance, AIG, American Fidelity Insurance, Farmers Insurance Group, Guardian Life Insurance, Lincoln National, or Mutual of Omaha, all of whom Mr. Mirabelli believes provide life insurance policies. *Id.* at 22:12–25:15.

The fifteen inquiries were made by email over a few days in March 2015; two of the providers did not respond. *Id.* at 17:25–18:25,19:8–17; *see also* Estate Ex. C-3. The emails identified Steven and Melinda and asked: "Can you please check for any coverage on these individuals?" *Id.* at 19:24–20:7. Mr. Mirabelli's email inquiries did not specifically ask whether Steven had coverage on January 2, 2014. *Id.* at 20:8–13, 21:9–15. In his affidavit, Mr. Mirabelli states that the responses indicated "that they had searched their databases and could not locate any policy insuring [Steven's] life." MetLife Ex. 2, ¶ 12. At his deposition, Mr. Mirabelli agreed that there could have been prior insurance coverage even though an email response that there was no coverage in March 2015 could also be accurate. Estate Ex. C 21:21–22:11.

During the investigation, Mr. Mirabelli learned from Melinda's father that Steven worked as a lineman for a power company. *Id.* at 27:12–19. MetLife received a verification of employment from Exelon Corporation ("Exelon") showing that Steven worked there from

January 5, 2009, to January 27, 2014. Estate Ex. A, ECF No. 97-2. After MetLife received the verification of employment, Mr. Mirabelli did not contact Exelon. *See* Estate Ex. C 33:11–17, 36:2–4. At the time of Melinda's Application on January 2, 2014, Exelon offered its full-time employees life insurance and accidental death insurance. *See* Estate Ex. B, ECF No. 97-2.

As part of the investigation, Mr. Mirabelli obtained copies of Melinda's medical records to verify the information on the Application. MetLife Ex. 2, ¶ 6.

Mr. Mirabelli turned over the results of his investigation to the Life Claims Department. *Id.* at ¶ 14. As a result of the investigation, MetLife determined that Melinda "misrepresented that her spouse had a two million dollar life insurance policy in effect at the time of her application for the policy." MetLife Ex. 1, ¶ 14. MetLife also determined that Melinda made a misrepresentation regarding her medical history. *Id.* at ¶ 15. MetLife considered both to be material misrepresentations. *Id.* at ¶¶ 14, 15. In his March 19, 2018 affidavit, Lee Fluharty, MetLife's Assistant Vice-President for the Life Insurance Underwriting Department, confirmed the decision that both misrepresentations were material to MetLife's acceptance of the risk in issuing the Policy. *Id.* at ¶¶ 17, 18. Mr. Fluharty agrees with the decision that, had the statements in the Application been answered correctly and had not been misrepresentations, MetLife would not have issued the Policy. *Id.* at ¶ 19.

MetLife's underwriting guidelines in effect at the time of the Application "provide that when an applicant for a life insurance policy is financially dependent on another person, the other person must have at least an equal amount of insurance in order to obtain coverage in a face amount greater than $125,000." *Id.* at ¶ 21; *see also* MetLife Ex. 1-E, ECF No. 88-6. Mr. Fluharty states in his affidavit that, "had [MetLife] known at the time [Melinda] completed the Application that her spouse, Steven Lindsey, did not have a life insurance policy with a face

7

amount of coverage at least equal to the face amount of the policy applied for by Melinda Lindsey, it would not have issued the Policy." MetLife Ex. 1, ¶ 22.

On June 25, 2015, MetLife sent correspondence to Steven communicating that there were material misrepresentations in the Application regarding his life insurance and Melinda's medical history and that, as a result, the Policy was void. MetLife Ex. 1-D, ECF No. 88-5.

On March 11, 2016, Steven was convicted of Melinda's murder. Estate SJ Ex. E.

In his March 19, 2018 affidavit, Mr. Fluharty states, "[T]o date no such policy [for Steven] was ever located, identified, or submitted despite [MetLife] conducting a thorough and reasonable investigation and despite lengthy opportunity for any claiming or beneficiary party to locate, identify, or submit such a policy." MetLife Ex. 1, ¶ 14.

## PROCEDURAL BACKGROUND

On March 16, 2016, MetLife filed its Complaint for Rescission [ECF No. 4] in this Court against Steven Lindsey and the Estate of Melinda Lindsey. MetLife seeks to rescind the Policy based upon the alleged material misrepresentations in the Application regarding Steven's life insurance and Melinda's medical history and asks for a declaratory judgment that the Policy is rescinded and that coverage under the Policy is void. *See* Compl. 7. On June 8, 2016, MetLife filed a First Amended Complaint for Rescission [ECF No. 14], adding as a defendant Julie Kirby, in her capacity as Personal Representative of the Probate Estate of Melinda Lindsey. On June 10, 2016, the Estate of Melinda Lindsey and Julie Kirby in her capacity as Personal Representative of the Probate Estate of Melinda Lindsey (collectively, the "Estate") filed an Answer and Counterclaims for breach of contract (Count I), estoppel and waiver (Count II), and breach of the covenant of good faith and fair dealing (Count III). *See* ECF No. 16. MetLife filed an Answer [ECF No. 21] to the Counterclaims.

MetLife deposited the life insurance premium refund with the Clerk of Court. *See* ECF Nos. 41–43, 60, 61, 66, 67, 69, 71–74, 76–78, 81.

MetLife filed the instant Motion for Summary Judgment [ECF No. 87]. The Estate filed a response [ECF No. 97], and MetLife filed a reply [ECF No. 98]. With its reply brief, MetLife filed a Supplemental Designation of Evidence [ECF No. 99] and a Motion to Strike [ECF No. 100], asking the Court to strike portions of the Affidavit of the Estate's designated expert John F. Fitzgerald. The Estate also filed a Motion to Strike [ECF No. 103], asking the Court to strike MetLife's Supplemental Designation of Evidence and the corresponding portions of the reply brief. Both motions to strike are fully briefed. *See* ECF Nos. 101, 102, 104–07.

At a telephonic conference on March 12, 2021, the Court raised the issue of service of process on Steven Lindsey. Ruling on a motion filed by the Estate, the Court dismissed Steven Lindsey pursuant to Federal Rule of Civil Procedure 4(m). *See* ECF No. 134. However, MetLife's claim for recission proceeds against the Estate because Steven Lindsey, who has been designated a constructive trustee under Indiana's codified slayer rule, has no legal interest in the Policy proceeds. *Id*.

## ANALYSIS

In its motion for summary judgment, MetLife seeks judgment in its favor on its claim for rescission of the Policy as well as on the Estate's counterclaims. The Court considers the motion as to each claim in turn.

A. **MetLife's Claim for Rescission**

MetLife's First Amended Complaint brings a claim to rescind Melinda's life insurance Policy and coverage under the Policy as void *ab initio*. MetLife alleges that Melinda made material misrepresentations on the Application regarding both her medical history and the

9

existence of life insurance for her spouse, Steven, upon whom she was financially dependent. In the instant motion, MetLife seeks summary judgment on its claim for rescission solely based on the alleged material misrepresentation regarding Steven's life insurance policy.

Under Indiana law, "a material misrepresentation or omission of fact in an insurance application, relied on by the insurer in issuing the policy, renders the coverage voidable at the insurance company's option." *Foster v. Auto-Owners Ins., Co.*, 703 N.E.2d 657, 659 (Ind. 1998) (quoting *Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664, 672 (Ind. 1997)).[1] "False representations concerning a material fact, which mislead, will void an insurance contract, just as any other contract, regardless of whether the misrepresentation was innocently made or made with a fraudulent intent." *Bennett v. CrownLife Ins. Co.*, 776 N.E.2d 1264, 1269 (Ind. Ct. App. 2002) (citation omitted). "A representation is material if the fact omitted or misstated, if truly stated, might reasonably have influenced the insurer in deciding whether to reject or accept the risk or charge a higher premium." *Ruhlig v. Am. Cmty. Mut. Ins. Co.*, 696 N.E.2d 877, 880 (Ind. Ct. App. 1998) (citation omitted).

In its motion, MetLife argues that Melinda's statement in her January 2, 2014 Application that Steven had insurance with a value of $2,000,000 was a misrepresentation. And, MetLife argues that the misrepresentation was material because MetLife would not have issued the Policy if Steven did not have a life insurance policy with a face amount of coverage at least equal to the face amount of the policy applied for by Melinda. As the party with the burden of proof at trial, MetLife must demonstrate why the record is so one-sided on each element as to rule out the prospect of a finding in favor of the Estate. To support its motion, MetLife offers the

---

[1] In addition, "a party seeking rescission must return all consideration or benefits received under the contract." *French v. State Farm Fire & Cas. Co.*, 950 N.E.2d 303, 311 (Ind. Ct. App. 2011) (citation omitted). MetLife has deposited the life insurance premiums with the Clerk of Court.

10

affidavit of its investigator, Mr. Mirabelli, and the affidavit of its Vice President, Mr. Fluharty. The instant motion fails at the first prong because there is a genuine dispute of material fact as to whether Melinda's statement about Steven's insurance was false. For the reasons set forth below, the affidavits are insufficient to meet MetLife's burden to "establish affirmatively the lack of 'sufficient evidence favoring'" the Estate to return a verdict for MetLife. *Reserve Supply Corp.*, 971 F.2d at 42 (quoting *Anderson*, 477 U.S. at 249–50).

Mr. Mirabelli's affidavit establishes only that his investigation did not uncover any evidence of a life insurance policy for Steven. However, because of the limited and incomplete nature of Mr. Mirabelli's investigation, a genuine dispute of fact remains as to whether Steven had life insurance on January 2, 2014. First, Mr. Mirabelli contacted only fifteen companies to inquire whether Steven had a life insurance policy, and the companies selected were based on personal contacts he had developed over the years as an investigator. For example, Mr. Mirabelli did not contact Allstate Insurance Company, American Family Insurance, AIG, American Fidelity Insurance, Farmers Insurance Group, Guardian Life Insurance, Lincoln National, or Mutual of Omaha, all of whom he believes provide life insurance policies. Thus, it is possible that an insurer *not* contacted by Mr. Mirabelli had a policy for Steven on January 2, 2014.

Second, two of the fifteen insurers did not respond to Mr. Mirabelli's inquiry. Thus, it is possible that one of those two providers issued a life insurance policy for Steven that was in effect on January 2, 2014.

Third, Mr. Mirabelli's March 2015 email to the fifteen insurance companies did not specify the time frame of his inquiry. Although the relevant question is whether Steven had a life insurance policy at the time Melinda submitted the Application on January 2, 2014, Mr. Mirabelli's email did not ask if the insurers had a policy for Steven on January 2, 2014, but

11

rather: "Can you please check for any coverage on these individuals?" In his deposition, Mr. Mirabelli agreed that there could have been prior insurance coverage even though the email response that there was no coverage in March 2015 could also be accurate.

Next, as argued by the Estate, MetLife did not investigate whether Steven had a life insurance policy through his employer, Exelon, as of January 2, 2014. During the investigation, MetLife established Steven's employment with Exelon from January 5, 2009, to January 27, 2014, by obtaining a verification of employment. Thus, MetLife knew that Steven was employed by Exelon at the time of Melinda's Application on January 2, 2014, and Melinda indicated on her Application that his income was $180,000. Yet, Mr. Mirabelli did not contact Exelon to determine whether Exelon provided Steven with group life insurance and, if so, the amount of coverage. In support of its response brief, the Estate offers evidence that, at the time of Melinda's Application on January 2, 2014, Exelon offered its full-time employees life insurance and accidental death insurance. Thus, it appears possible that Steven had insurance through his employer, Exelon, on January 2, 2014.

Finally, Mr. Mirabelli did not contact Steven during his investigation. Nor is there evidence that anyone at MetLife contacted Steven prior to the determination that Melinda made a false statement on the Application regarding Steven's insurance. The first communication with Steven was MetLife's June 25, 2015 letter informing him that the Policy was void based on MetLife's determination that Melinda had made material misrepresentations on her Application.

MetLife also offers the March 19, 2018 affidavit of its Vice President, Mr. Fluharty, that, as of the date of his affidavit, no one had come forward with proof of insurance for Steven, which MetLife argues supports its initial conclusion that Steven did not have a life insurance policy at the time of the Application. In its reply brief, MetLife contends that the Estate, as the

nonmoving party, must come forward with evidence that Steven had a life insurance policy. However, this is an improper attempt to shift the burden to the Estate on an issue on which MetLife bears the burden of proof at trial. "A party opposing summary judgment does not have to rebut factual propositions on which the movant bears the burden of proof and that the movant has not properly supported in the first instance." *Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 662 (7th Cir. 2011). It is MetLife's burden to establish that Melinda's statement on the Application was false, and MetLife has not properly supported its assertion that Melinda made a false statement. The fact that neither Steven, who was being prosecuted for and was then convicted of Melinda's murder, or anyone else came forward with evidence of an insurance policy since MetLife sent the June 25, 2015 letter does not establish that Steven did not have insurance on January 2, 2014.[2]

In response to MetLife's motion, the Estate has shown that there is a genuine dispute of material fact for trial as to whether Melinda made a false statement on the Application regarding Steven's life insurance. Accordingly, the Court denies MetLife's motion for summary judgment on its claim for rescission.[3]

**B.    The Estate's Counterclaims**

*1.    Breach of Contract*

In Count I for breach of contract, the Estate alleges that MetLife breached the Policy by failing and refusing to pay the beneficiary the sum of $1,100,000 under the Policy following Melinda's death and a demand for payment. MetLife seeks summary judgment on this claim

---

[2] The Court need not consider the new evidence offered in MetLife's Supplemental Designation of Evidence or the corresponding arguments in its reply brief, all of which relate to MetLife's unsuccessful litigation discovery efforts to obtain information from Steven. Thus, the Estate's motion to strike is moot.
[3] In relation to MetLife's motion to strike the affidavit of John F. Fitzgerald, the Court did not consider Mr. Fitzgerald's expert opinion on industry standards in claims handling to determine that there is a genuine dispute of material fact on this claim.

based on its defense of rescission. *See* Answer to Countercl. 13, ECF No. 21; *Am. Fam. Ins. Grp. v. Ford*, 293 N.E.2d 524, 577 (Ind. Ct. App. 1973) ("[R]escission of a contract is an affirmative defense." (quoting *Storer v. Markley*, 73 N.E. 1081 (Ind. 1905))). Here, MetLife relies on the same arguments made in support of its own claim for rescission—namely, that it is entitled to rescind the Policy based on Melinda's alleged material misrepresentation in the Application regarding Steven's insurance. For the same reasons set forth above, MetLife cannot meet its burden on this defense because there is a genuine dispute of material fact as to whether Melinda's statement was false. Therefore, the Court denies MetLife's motion for summary judgment on the Estate's breach of contract counterclaim.

2. *Estoppel/Waiver and Breach of Duty of Good Faith and Fair Dealing*

In Count II, the Estate alleges that MetLife waived its right to rescind the Policy and should be estopped from denying payment under the Policy. In Count III, the Estate alleges that MetLife breached its duty of good faith and fair dealing. Both claims are based on an alleged failure by MetLife to investigate the statements in Melinda's Application prior to her death. Seeking summary judgment on both counterclaims, MetLife argues that it had no duty under Indiana law to investigate the truthfulness of Melinda's statements in her Application and that it was not on inquiry notice of a need to investigate because Melinda signed the Application and a statement confirming its accuracy. The Estate responds that MetLife had independent knowledge to put it on inquiry notice of the need to investigate the truthfulness of Melinda's statement regarding Steven's life insurance. For the reasons set forth below, the Court denies the motion as to these counterclaims.

The Indiana Supreme Court has held that an "'insurer may rely on representations of fact in the application without investigating their truthfulness' and has 'no duty to look beneath the

14

surface' of the representations on the application." *Foster*, 703 N.E.2d at 660 (quoting *Guzorek*, 690 N.E.2d at 674; citing *State Farm Mut. Auto. Ins. Co. v. Price*, 396 N.E.2d 134, 137 (Ind. Ct. App. 1979)); *see also Goar v. Federated Life Ins. Co.*, No. 1:13-CV-919, 2015 WL 1608842, at *16 (S.D. Ind. Apr. 10, 2015) (quoting *Allied Prop. & Cas. Ins. Co. v. Good*, 938 N.E.2d 227, 232 (Ind. Ct. App. 2010) (quoting *Guzorek*, 690 N.E.2d at 674))). In *Foster*, the court explained that "[i]t is not unreasonable to demand that an insured supply accurate and complete information, read the application before signing it, and suffer the consequences if an omission or misstatement in the application is material to a subsequent loss." 703 N.E.2d at 660.

However, "an insurer cannot avoid coverage where it had knowledge of the facts notwithstanding the material misrepresentations, or where a reasonable person would have investigated further." *Id.* (quoting *Guzorek*, 690 N.E.2d at 674; citing *Johnson v. Payne*, 549 N.E.2d 48, 51–52 (Ind. Ct. App. 1990)). In *Guzorek*, the Indiana Supreme Court explained that "the insurer may rely on representations of fact in the application without investigating their truthfulness, *unless* there is some reason to believe the representations are false." *Guzorek*, 690 N.E.2d at 674 (emphasis added) (citing *Price*, 396 N.E.2d at 137); *see also Ruhlig*, 696 N.E.2d at 881). "Thus, when the insurer had sufficient information to place it on inquiry notice of possible falsity, whatever facts a reasonably diligent investigation would have discovered are imputed to the insurer." *Guzorek*, 690 N.E.2d at 674 (citing *Payne*, 549 N.E.2d at 51–52).

Assuming that Steven did *not* have life insurance through his employer or otherwise on January 2, 2014, the Estate argues that MetLife's independent knowledge that Steven was interested in obtaining an insurance policy for himself put MetLife on inquiry notice of a possible falsity in Melinda's Application. In support, the Estate cites the October 17, 2013 phone

15

conversation between Steven and MetLife agent Mr. Ambler and the January 31, 2014 phone conversation between Steven and MetLife representative Ashley.

The Estate has shown a genuine dispute of material fact as to whether MetLife was on inquiry notice regarding Steven's insurance status based on the October 17, 2013 telephone conversation between Steven and Mr. Ambler.[4] In that conversation, Steven told Mr. Ambler, "I'm looking to get my life insurance policy renewed." Steven explained that he had a policy for a long time with MetLife but that he got divorced and his "ex-wife got the balance of the term life today and the other one just got canceled." Steven told Mr. Ambler that he would "like to at least get the short-term one going again until I can get my mind wrapped around so I can start the term life insurance policy." Steven also expressed to Mr. Ambler an interest in obtaining a policy for Melinda, who was his fiancée at the time. Mr. Ambler is the same agent who then spoke to Melinda on January 2, 2014, and filled out her Application. The Estate argues that this conversation with Steven, along with unsuccessful subsequent efforts to complete Steven's application, put Mr. Ambler on notice to investigate the truthfulness of Melinda's answer that Steven had $2,000,000 in life insurance at the time of her January 2, 2014 Application.

In its reply brief, MetLife does not address the Estate's assertion that Mr. Ambler had independent knowledge based on his conversation with Steven, nor does MetLife argue that the conversation was insufficient to put Mr. Ambler, and thus MetLife, on notice to investigate the truthfulness of Melinda's statement in her Application. Rather, MetLife contends that, as a matter of law, its knowledge is irrelevant because Melinda's signature on the Application confirming that her answers were true entitles MetLife to rely on her statements in the Application, even if MetLife allegedly knew the answers were not correct. However, the cases

---

[4] As a result, the Court need not address on this motion whether the January 31, 2014 phone conversation between Steven and MetLife representative Ashley also put MetLife on inquiry notice.

16

cited by MetLife are distinguishable on the issue of waiver because in each case, the applicant personally knew the correct information and could have ensured it was correct on the application prior to signing.

In *Foster* and *Buckeye*, the applicant gave correct information to the agent, but the agent included incorrect information in the application. Thus, the applicant was in a position to recognize the false information prior to signing, but signed anyway, attesting to the truthfulness of the information in the application. In each case, the court held the applicant responsible for the misrepresentation, notwithstanding the agent's involvement in filling out the application. *See Foster*, 703 N.E.2d at 659–60 (citing *Metro. Life Ins. Co. v. Alterovitz*, 14 N.E.2d 570, 574 (Ind. 1938)); *Buckeye State Mut. Ins. Co. v. Hall*, No. 2:05-CV-21, 2006 WL 3450603, at *7–8 (N.D. Ind. Nov. 29, 2006); *see also Goar*, 2015 WL 1608842, at *12 (citing *Brennan v. Hall*, 904 N.E.2d 383, 387 (Ind. Ct. App. 2009)); *Am. Fam. Mut. Ins. Co. v. Jeffery*, No. IP 98-1085-C H/G, 2000 WL 680410, at *3–7 (S.D. Ind. Feb. 28, 2000); *Fed. Kemper Ins. Co. v. Brown*, 674 N.E.2d 1030, 1034 (Ind. Ct. App. 1997) (citing *Alterovitz*, 14 N.E.2d at 574–75). In *Wachel* and *Ruhlig*, which involved misrepresentations regarding the applicant's medical history, the court held that the applicant who signed the application attesting to its truthfulness was responsible for the material misrepresentations and that the insurer had no duty to obtain the applicant's medical records to check for inconsistencies or misstatements on the application. *See Wachel v. First Colony Life Ins. Co.*, No. 2:05-CV-292, 2008 WL 73647, at *18–20 (N.D. Ind. Jan. 4, 2008); *Ruhlig*, 696 N.E.2d at 881.[5]

---

[5] Notably, in each of those cases cited above, there was no factual dispute as to the falsity of the statement in the application. In this case, whether Melinda's statement that Steven had $2,000,000 in life insurance was false remains a disputed fact for trial.

In contrast, the Estate is arguing that Mr. Ambler had independent knowledge based on his earlier conversation with Steven on October 17, 2013. Melinda's signature on the January 2, 2014 application affirmed that, "to the best of my knowledge and belief, all statements are true and complete." It is unclear how Melinda's signature would relieve MetLife of a duty to investigate based on Mr. Ambler's independent knowledge separate from what Melinda told him or what Melinda herself knew. *See, e.g.*, *Wachel*, 2008 WL 73647, at *20 (finding that, even though the insurers had no duty to obtain medical records to verify statements in a signed application, once the insurers in fact obtained medical records and "obtained independent knowledge on their own initiative prior to issuing policies[,] [t]hey cannot now claim ignorance of the information that came to light through their investigation" (citing *Foster*, 703 N.E.2d at 660)); *see also Guzork*, 690 N.E.2d at 674 (noting that there was no claim that the insurer knew or should have known the fact that would have put it on inquiry notice of the material misrepresentation in the application); *Jeffery*, 2000 WL 680410, at *7 (holding that the insured was responsible for the material misrepresentation in the application, even though the agent knew the information was false, because the insured signed the application, but also noting that the insured "has submitted no evidence indicating that [the insurer] had independent knowledge" related to the material misrepresentation).

MetLife also argues that, because Melinda signed the Application, MetLife was not required to cross-check the accuracy of the statements on her application with other forms or information, "including any telephone recordings with third-party vendors, as [the Estate] allege[s]." MetLife Reply 12, ECF No. 98. This appears to be a reference to the recordings of Steven's phone conversations with Mr. Ambler on October 17, 2013, and Ashley on January 31, 2014. However, the Estate is not arguing that someone at MetLife should have listened to the

18

recordings of Steven's phone calls and then cross-checked them against Melinda's Application. Rather, the Estate is arguing that the conversations themselves put Mr. Ambler and Ashley, as agents of MetLife, on notice that further investigation was necessary.

Moreover, the cases cited by MetLife are distinguishable because the insurer in each case was not required to cross-check prior applications or documents submitted by the *applicant*. *See Foster*, 703 N.E.2d at 660 (holding that, as a matter of law, an insurer has no obligation to cross-check the accuracy of an application with other applications of the "same applicant"); *Goar*, 2015 WL 1608842, at *14, *16 ("Mr. Goar's answers on the enrollment materials for the group health insurance policy were not part of the Application, Acknowledgement, or Policy under which Mr. Goar seeks coverage here, and Federated was under no obligation to cross reference the information he provided in the Application with his disclosures in that separate context."). Here, Mr. Ambler's earlier conversation was with Steven, not Melinda.

On the record before the Court, there is a question for the jury as to whether Mr. Ambler had "some reason to believe [Melinda's] representations are false," *Guzorek*, 690 N.E.2d at 674. Therefore, the Court denies MetLife's motion for summary judgment on Counts II and III of the Estate's Counterclaim.[6]

## MOTIONS TO STRIKE

As set forth above, the Court's ruling did not rely on either the new evidence and argument submitted by MetLife with its reply brief or Mr. Fitzgerald's opinions submitted by the Estate. Therefore, the Court denies both motions to strike as moot. *See, e.g.*, *Vaught v. Quality Corr. Care, LLC*, No. 1:15-CV-346, 2018 WL 1900153, at *2 (N.D. Ind. Apr. 19, 2018) ("Because the Court is able to distinguish which exhibits, affidavits, statements, and commentary

---

[6] The Court did not consider Mr. Fitzgerald's expert opinion on industry standards in claims handling to determine that there is a genuine dispute of material fact on these counterclaims.

may properly be considered when deciding whether summary judgment is appropriate, the Court declines to strike these statements from the Plaintiff's Memorandum.").

## CONCLUSION

Based on the foregoing, the Court hereby DENIES MetLife's Motion for Summary Judgment [ECF No. 87], DENIES as moot MetLife's Motion to Strike the Affidavit of John F. Fitzgerald [ECF No. 100], and DENIES as moot the Estate's Motion to Strike MetLife's Supplemental Designation of Evidence and Corresponding Portions of Reply Brief [ECF No. 103]. All claims and counterclaims remain pending for trial.

SO ORDERED on November 2, 2021.

s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT